UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-CR-577-8 |
| | . | CASE NO. 4:22-MJ-2398-05 |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | THURSDAY, OCTOBER 27, 2022 |
| EMERY GOODLEY | . | 01:31 P.M. TO 02:28 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . .


PRELIMINARY EXAMINATION/DETENTION HEARING

BEFORE THE HONORABLE SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: MAYRA M. MARQUEZ

CASE MANAGER:                  SHANNON JONES

OFFICIAL INTERPETER:           NONE PRESENT




TRANSCRIPTION SERVICE BY:

**TRINITY TRANSCRIPTION SERVICES**
**1081 Main Street**
**Surgoinsville, TN 37873**
**281-782-0802**
battshott@aol.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**TRINITY TRANSCRIPTION SERVICES**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
UNITED STATES OF AMERICA,     .   CASE NO. 4:22-CR-577-8
                              .   CASE NO. 4:22-MJ-2398-05
          PLAINTIFF,          .
                              .
      V.                      .   HOUSTON, TEXAS
                              .   THURSDAY, OCTOBER 27, 2022
EMERY GOODLEY                 .   01:31 P.M. TO 02:28 P.M.
                              .
          DEFENDANT.          .
. . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,     .   CASE NO. 4:22-MJ-2398-02
                              .
          PLAINTIFF,          .
                              .
      V.                      .
                              .
MARKEL BROWN,                 .
                              .
          DEFENDANT.          .
. . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA,     .   CASE NO. 4:22-MJ-2398-07
                              .
          PLAINTIFF,          .
                              .
      V.                      .   HOUSTON, TEXAS
                              .
TRAVONTE ARDOIN,              .
                              .
          DEFENDANT.          .
. . . . . . . . . . . . . . . .
```

PRELIMINARY EXAMINATION/DETENTION HEARING

BEFORE THE HONORABLE SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE

Appearances: (See next page)

Appearances:


**For the GOVERNMENT:**              **LISA MARIE COLLINS, ESQ.**
                                    Assistant United States Attorney
                                    Office of the United States
                                      Attorney
                                    1000 Louisiana, Suite 2300
                                    HOUSTON, TX 77002

**For DEFENDANT GOODLEY:**           **ROBERT FICKMAN, ESQ.**
                                    440 Louisiana St., Suite 200
                                    Houston, TX 77002

**For DEFENDANT BROWN:**             **BRETT A. PODOLSKY, ESQ.**
                                    Attorney at Law
                                    917 Franklin Street, Suite 510
                                    Houston, TX 77002

**DEFENDANT TRAVONTE ARDOIN:**       **MARC C. CARTER, ESQ.**
                                    Attorney at Law
                                    1001 McKinney Street, Suite 1600
                                    Houston, TX 77007

**U.S. PROBATION:**                  **SERGIO SALINAS**

**UNITED STATES MARSHAL:**           **MARTIN WHITE**

Transcription Service:              Cheryl L. Battaglia
                                    Trinity Transcription Services
                                    1081 Main Street
                                    Surgoinsville, TN 37873

1

1      **Houston, Texas; Thursday, October 27, 2022; 01:31 p.m.**

2          **THE COURT:**  Okay.  Please be seated.

3      **(Pause in the proceeding.)**

4          **THE COURT:**  *22-MJ-2398, Markel Brown.*

5          Okay.  You're here with your attorney, Podolsky.  Or

6  is he -- he's not here yet?

7          **UNKNOWN FEMALE:**  He was just here.  (Indiscernible.)

8          **THE COURT:**  Okay.  *Emery Goodley.*

9          **MR. FICKMAN:**  He's present with counsel, your Honor.

10         **THE COURT:**  Okay.  And he's here with Mr. Fickman.

11         And Travonte Ardoin is here with Judge Carter.  So

12  we're all -- okay.

13         Okay.  So we'll wait for -- or -- or we don't -- I

14  don't think we need Mr. -- so why don't we start with -- all

15  we're doing is the arguments as to the three.

16         **MS. COLLINS:**  Your Honor?

17         **THE COURT:**  Oh, hold on sec.

18         Mr. Podolsky just came in.  So we're all good.

19         **MR. PODOLSKY:**  Sorry about that, Judge.

20         **THE COURT:**  Okay.  Go ahead, Miss Collins.

21         **MS. COLLINS:**  Yes, sir.

22         Yesterday in the course of questioning of Detective

23  Bock, there was some questions that I was concerned may have

24  implied a portion of the proffer was incorrect.  Specifically,

25  there were questions about not having been able to locate the

1    portion of Emery Goodley's statement where he talks about

2    potentially killing someone.

3         I have spoken to defense counsel with -- both prior

4    to the hearing.  We have located that.  We have both heard it.

5    And I just wanted to read it officially so the Court could

6    have, you know, no concerns with what was said in the proffer.

7         And I -- I think the defense counsel and I are in

8    agreement.  So I don't think there's any objection to the me

9    doing so.

10        **THE COURT:**  Okay.

11        **MR. FICKMAN:**  I don't object to it.  I just -- I'll

12    argue what I need to argue at the appropriate time.  We did

13    listen to it together.  And I believe this is an accurate

14    rendition of what we both heard.

15        **THE COURT:**  Okay.  Go ahead.

16        **MS. COLLINS:**  Yes, sir.

17        Emery states,

18        "If I'm going to do time, I'm going to do

19        all of it.

20        Officer asks, but why?

21        Emery responds, I know my anger.  I'm going

22        to kill somebody down there.  I'm not going

23        to let nobody play with me.

24        Officer again asks, but why?

25        And Emery responds, I have enemies.  I'm

1           gang related.  I know this life."

2               **THE COURT:**  Okay.

3               **MS. COLLINS:**  That's all, your Honor.

4         **(Pause in the proceeding.)**

5               **THE COURT:**  Okay.  So how do we -- is there anything

6     else with the agent that -- well, okay.

7               Why don't we go -- who wants to start first with

8     their -- with their argument?  So I'm sorry, Mr. Fickman, let's

9     proceed like this like we did this morning.

10              Whatever you want to proffer, you'll go ahead and

11    proffer.  Then make your argument.  Then I'll let the next

12    person go.  And then Miss Collins will respond to everybody.

13              **MR. FICKMAN:**  Please the Court.

14              **THE COURT:**  Okay.

15              **MR. FICKMAN:**  I proffer the testimony on behalf of

16    Emery Goodley of Miss Christy (phonetic) Babenaux (phonetic)

17    who's present.  Will you please stand up, ma'am?  Okay.  Thank

18    you.  You can be seated.

19        **(Pause in the proceeding.)**

20              **MR. FICKMAN:**  I'm also going to be proffering the

21    testimony of Micaela (phonetic) Kauffman (phonetic).  Would you

22    stand up, ma'am?  Okay.  You can be seated.  Thank you.

23              I just wanted the judge to see you all present in the

24    courtroom.

25              Your Honor, I'm proffering the testimony of Miss

4

1   Christy Babenaux, the lady on the left.  She's a -- lives on

2   XXXXXXXX XXXXXX XXXXX in Houston, Texas.  If the Court wants

3   her specific address, I'd be happy to be able to provide it,

4   just a little -- don't want to do it in open court.

5          She's married, husband James.  Has two children.

6   She's 47 years old.  By way of background, she's from Houston,

7   Sterling High School, some college.  And she worked for 24

8   years for Chase Bank as a loan officer.

9          She retired, took an early retirement, so she could

10  pursue her ministry, which she has working on pursuing right

11  now.  That is, a ministry of the gospel.  She attended the

12  Christway (phonetic) Theological School here in Houston.  And

13  her ministry is about a year old.  And that's what she's doing

14  with her life.

15         Now the reason I'm proffering her, and all the way --

16  also, your Honor, she's got no prior criminal record and no

17  drug or alcohol problem.

18         She is the aunt of Emery Goodley.  And for the most

19  part, she and his grandmother raised him.  He lives some with

20  his mother.  But he was primarily raised with his grandmother

21  and his aunt who's here, who's the person I'm proffering.

22         So she's known him his entire life.  She's his

23  maternal aunt.  She raised him and his siblings.  And as far as

24  the factors that the Court is to consider under 3142, his

25  family ties in -- in this area she would say are significant.

1    And the bulk of his family lives in Houston.

2           **THE COURT:**  So -- so -- so let me stop you,

3    Mr. Fickman.

4           Let me say this, the flight is not a concern of mine.

5    So -- so first, I forgot to mention for you all.  Because this

6    is a double presumption case, there's only, you know, both on

7    the -- the drugs and the guns.

8           It's your burden, and to rebut that presumption.  But

9    my concern is a danger to the community and not flight risk, as

10   to any of the Defendants.

11          **MR. FICKMAN:**  Oh, and -- and I -- and I will address

12   that, your Honor.

13          **THE COURT:**  Okay.

14          **MR. FICKMAN:**  I was trying to give you a little bit

15   of background of the matter.

16          **THE COURT:**  Okay.  Sounds good.

17          **MR. FICKMAN:**  And I'll answer that, your Honor.

18          **THE COURT:**  Okay.

19          **MR. FICKMAN:**  Okay.  And this -- the proffers are

20   relatively short.

21          **THE COURT:**  Okay.

22          **MR. FICKMAN:**  She would testify, just in terms of his

23   history, that he was a good student.  In fact, when she was

24   raising him when he was 11 years old, he participated in a

25   national championship of -- that was here in Texas for chess

1   players.

2          I have here Defense Exhibit Number 1 and Number 2.

3   I've tendered a copy to the State.

4          **THE COURT:**  Okay.  We'll admit those.

5          **(Goodley Exhibits Number 1 and 2 were received into**

6   **evidence.)**

7          **THE COURT:**  Okay.

8          **MR. FICKMAN:**  What they show, your Honor, this is

9   kind of remarkable, that is that for unrated players, when he

10  was 11 years, cause that's 11 years ago, he's 22 now.  He came

11  in first in the national championship for sixth graders is the

12  way I read it.  And that's confirmed by his aunt in terms of

13  her knowledge.

14          So this is a young man of, I would say, above average

15  intellect.  She also confirmed that as he's coming through

16  school, he want to magnate schools based on his grades.  And he

17  was an honor roll student.

18          So this is an intelligent young man who, I -- I think

19  it's -- it's important, it does go to dangerousness.  Because I

20  think he has the brain power.  While he may say and do -- there

21  may be some history of him saying and doing some foolish, and

22  stupid, and potentially dangerous things, he's also an

23  intelligent young man that has the intellect to comply with

24  rules.  At least has the -- the -- the -- the intelligence to

25  do that.

1          When he was 13, according to the criminal record, he

2   got into a juvenile problem.  I think he moved out of his

3   aunt's house, was staying at his mother's house.  And the

4   supervision was not so good there.

5          When he was 14, according to his aunt, he moved back

6   in with her.  And at that time in the ninth grade, he was on

7   the football team.  He was a good student.  He did not get in

8   any trouble.

9          And then when he was 15, he returned living with his

10  mother.  And there if the Court looks at his record when he's

11  13 and then again when he's 15, he gets in trouble with the

12  law.  Both of those are periods where he's not living with the

13  aunt, whose testimony I'm proffering.

14         So when he was in a supervised atmosphere, he did

15  well.  He abided by the rules and he actually excelled.  When

16  he was in a more of a unsupervised environment, he did not do

17  well, as is evident by the record.

18         As in terms of dangerousness, I would argue and

19  submit that -- that if the Court places him under stringent

20  conditions, and electronic monitor, and things of that type,

21  that he would not pose a danger to the community, especially if

22  his aunt was involved in the conditions.  Because with his

23  aunt, he's always done well.

24         His -- he's 22 years old now.  His aunt says she

25  stayed in touch with him when he got out of on -- at the

8

1  beginning of this year.  He got paroled.  But at the beginning

2  of this year, he was -- he was released.

3         And he stayed in touch with his aunt.  She said she

4  conducts Sunday services at her house where she put together

5  this ministry.  He comes to her house every Sunday, either with

6  his common law wife or by himself.

7         In this interim, he was actually term is baptized,

8  but I guess born again.  And she would act as in any capacity I

9  think the Court would ask her to act in, in order to provide

10  the Court assurances that he would not pose a danger to the

11  community.  In her personal opinion if she was involved in his

12  life, she does not believe he would pose a danger to the

13  community.  Because in those times in his life that she was

14  actively engaged with him in his life, he didn't pose a danger

15  to the community.  He excelled and did good things like winning

16  the first place in 11-year old chess contest.

17         I would next kind of the testimony of -- of Micaela

18  Koffman.  She's 22.  She's gainfully employed at Direct TV.

19  She's attending Calvin (phonetic) Community College.  She's

20  also Reserve Active Duty in the Army National Guard.  She's

21  been in that for four years.

22         She is a -- she's a productive citizen, your Honor.

23  She's -- everything she's doing is positive and productive.

24  And she's also serving our country.  She is the common law

25  wife, girlfriend, depending on how one defines it, of Emery

1    Goodley.

2            They live together on XXXXXX XXXXX.  And they've been

3    together since about 2019, prior to his going back into

4    custody.  Then they got back together when he was released

5    earlier this year, his parole on that -- that case.

6            So he's stayed in jail for a couple years.  Then he

7    was released, and they got back together.  They don't have any

8    kids.  She says that he works.  Confirmed again family ties.

9    In the past she confirms his work history as the Court has

10   before it.  And she confirms the rest of the information that I

11   related to the Court in terms of his -- her knowledge of his

12   history, since 15 and on.  But said he was a quarterback in the

13   9th grade before he got in trouble when he was 15 apparently.

14           There's -- another thing is that when he was in jail,

15   she would testify, to her knowledge he completed his GED.  He

16   got a welder's certificate.  He worked on a power plant

17   certificate.  And he also attended Navarro College either in

18   jail or when he got out, parttime.

19           She doesn't believe he has a drug or alcohol problem.

20   She lives with him, your Honor.  The fact that he doesn't

21   appear to have a drug or alcohol problem I think would increase

22   the likelihood that he could live among the rest of us and not

23   pose a threat.

24           She does not believe that he would pose a danger to

25   the community.  And I understand that it's a high burden.  But

1    these are the two people that know him best.  In their opinion,

2    if they were involved in the conditions that were placed on

3    him, they would actively be involved.  They agree to be --

4    actively be involved in his life.  And, in fact, his common law

5    wife or girlfriend, said that she would act as a custodian.

6            The Pretrial Service Report interviewed her and said

7    that she would qualify as, I think as, a, I don't know if it's

8    a custodian of -- that she would qualify in some capacity to be

9    involved with his bond.  That she met the criteria.  And I

10   don't have the report in front of me right now.  But I think

11   the Court still has its copy.

12           That's the proffer --

13           **THE COURT:**  Okay.

14           **MR. FICKMAN:**  -- argument.

15       **(Pause in the proceeding.)**

16           **THE COURT:**  Let me -- Miss Collins, do you want to --

17   to you want to go first before the -- do you want them all to

18   present their proffers and then arguments differently?  Or do

19   you -- what's the most efficient way for you?

20           **MS. COLLINS:**  Probably efficient for the Court would

21   be just one argument.

22           **THE COURT:**  Yeah.  So why don't you make your

23   argument, Mr. Fickman.

24           **MR. FICKMAN:**  Okay.

25           Your Honor, addressing the testimony from yesterday,

11

1   just highlighting the points made by the -- that came out

2   through the agent's testimony and not the -- the -- going into

3   graphic detail, but just the high points.

4           First, the information that was related to the Court

5   today about the statement that was made.  I saw this was a

6   videotaped statement.  There's an ongoing conversation between

7   two agents and my client.  This is a short blurb of the entire

8   conversation.  I have not had an opportunity to watch the

9   entire tape.  So I don't know the context.

10          The words that were related to you by the Government,

11  I believe that's an accurate recitation of the words that were

12  said in that moment.  There is no -- well, one could interpret

13  it, certainly, it's not a good thing to say.  But one could

14  interpret it as non-specific, not enough to the words spoken

15  for the Government to take action like go file charges or

16  something like that.

17          As I was pointing out when we were talking earlier

18  that people say stupid things all the time that they don't

19  actually mean.

20          My client said that -- that he was going to do all

21  this time.  He wasn't going to let anybody play with him.  And

22  he'd end up killing somebody.  Well, that's in the context of

23  perhaps him trying to act tough.  I don't know.

24          But people say they're going to kill their boss all

25  the time and they don't mean that.  So I would ask the Court

1  not to put too much emphasis on those words.

2          As far as the actual evidence in this case, the agent

3  testified that Mr. Goodley was not under investigation when

4  this case began.  There was no Title 3 on his phone.  He was

5  not a member of Free Money.  That his voice did not appear on

6  any Title 3 wiretap.  And I think were, I believe the agent

7  said there were a number of wiretaps in this case.  I can't

8  remember the number.  I thought it was four or five.  I stand

9  corrected whatever the number was.  But his -- his voice had

10  not been identified on any of those wiretaps.

11          There was a firearm recovered in the vehicle, but the

12  agent testified that my client was never observed to be in

13  possession of a firearm.  When my client was observed coming

14  out of that house that supposedly the meeting was at, my client

15  was observed, but was not -- without a gun in his possession.

16          The vehicle was driving and a gun was seen thrown out

17  of the vehicle from the backseat is what the agent said.  So he

18  did not believe that that was done by my client.

19          At the time he was arrested, that is, my client, he

20  didn't run, fight, or resist.  He was, obviously, somewhat

21  surrounded.  So he didn't probably have much opportunity to do

22  any of those things.

23          But there are people that will run, fight, and resist

24  even if they're surrounded.  He didn't do any of that.  And, in

25  fact, he agreed to sit down and talk to the agents, which

1  clearly he did, and which probably was -- I point out was

2  uncounseled, which I think is -- is important.  And I'm not

3  saying they tricked him.  I'm just saying that that's -- that's

4  a factor for the Court's consideration.

5          In conclusion, I think that a conditions of release

6  can be fashioned.  This is a unique young man who is

7  operating -- who has the intellectual ability to understand and

8  comply.  I don't think that because a person maybe has a higher

9  IQ and can do well in a chess match should -- should -- they

10  should be treated differently.

11          I'm simply trying to indicate that this is not a guy

12  that's an idiot.  This is a smart young man who finds himself

13  in a bad place.  But I think if he has rules to follow, that he

14  would understand the rules.  And based on the representations

15  of his family members, I believe that he would follow those

16  rules.

17          Now I understand that there's -- there's the

18  presumption is hard to beat and hard to overcome.  I submit

19  that in this case that this is a young man that the Court could

20  take a chance with.

21          **THE COURT:**  Okay.  Thank you, Mr. Fickman.

22          Mr. Carter?

23      **(Pause in the proceeding.)**

24      **(Voices speaking off the record.)**

25          **MR. CARTER:**  Thank you, your Honor.

 1          First off, I have a couple of proffers.  My proffers

 2    were from the -- the parents.  And I -- and there was actually

 3    another one, the girlfriend, and I don't -- I'm not sure if I

 4    informed them yet, the Government, about that yesterday.  But

 5    the proffers are very similar.  They are not here.  They were

 6    here yesterday.  But they're working today.

 7          The first proffer would be from Demetria (phonetic)

 8    Ardoin, the mother.  She works for Harris Health Systems.  And

 9    she would sign on any -- any bond or any conditions that you

10    were to give the Defendant in this case, if he were to be

11    granted a bond.

12          The girlfriend is Dasja, D-a-s-j-a, Peters

13    (phonetic), also known as Daisy.  She works for security at

14    Allied -- it's -- it's -- I'm not sure, but it's -- the

15    company's Allied.  I can't ready my -- my -- Allied Universal

16    is what I believe it says.  But that is the company where she

17    does security.  And she's been there for five years.  And she

18    said she would also be willing to sign on any kind of bond.

19    And the father, similar.

20          Now, again, the -- the presumption is that there is

21    no conditions that would guarantee the safety of the community.

22    And so the presumption is that my client has to go to jail

23    while this is pending.

24          But as I offered yesterday, is I think that that

25    presumption is overcome because my client has been on -- on

1    community -- well, he's been on 24-hour house arrest on bond in

2    State Court the same -- same offense back on 8/14/2022.

3            All right.  So he has been on bond.  And while he's

4    been on bond, there have not been any violations from that

5    Court.  Now, to the Government's going to maybe argue that

6    there's some violations.  But that Court has not -- has not

7    done anything, any -- any violations, be called into court for

8    anything.  And, in fact, they say he made all his court

9    appearances.  He's done everything that he's supposed to do.

10            But I'll -- I'll get to some of these other matters.

11   So in that, he's on a 24-hour house arrest.  So he can't leave

12   the home.  He lives in the home with his mother, his brother

13   Terry, his co-Defendant, does not live there.  So I think

14   that's important for the Court to -- to recognize.

15       **(Pause in the proceeding.)**

16       **MR. CARTER:**  His -- he has no prior history.  No --

17   no record.  No criminal history.

18            He possessed a license to carry.  And that's why

19   he -- and with that license to carry, he had legally purchased

20   that -- that weapon that was at his home.  And it should be

21   noted that he was truthful with Pretrial Services when they

22   asked him, do you have weapons.  And he said, "Yes."

23            Now the -- the circumstances in a State Court bond

24   are very, very different.  They -- you're in the courtroom.

25   You appear.  And the Judge says these are the things.  And

1   then, you know, there's a laundry list, right?

2           But there's never any -- any question hey, you know,

3   do you have a weapon?  You need to surrender it.  Give it to

4   this person.  Doesn't happen in State Court.

5           So he had a -- he had a gun.  He had it.  He had

6   possessed it lawfully.  And then when asked about it, he

7   surrendered.  He informed the -- the Government and it was

8   surrendered.

9           **(Pause in the proceeding.)**

10          **MR. CARTER:**  Now, there's other interesting things.

11          He was not -- he's not a gang member.  There's no

12  social media connecting him to this event.  There's no wiretaps

13  or intercepts connecting him to this event.

14          There is, of course, you know, the elephant in the

15  room is extraneous that the -- that the Government had brought

16  before the Court.  And -- and, of course, you know, I

17  understand the concern.  But there -- there's also the fact

18  that, you know, he hasn't been charged.

19          And the last time I checked, he's got a presumption

20  of innocence.  Especially in an event where he's not even been

21  charged.  So, I think that based on his presumption of

22  innocence, he should not be held -- that should not be held

23  against him.  And he has not been charged, as well as, the fact

24  that he has no prior criminal history.  He's been on bond in

25  State Court.  And he's been compliant.

1          With that, your Honor.  I'd like to yield the floor.

2          **THE COURT:**  Okay.  Thank you, Judge Carter.

3          Okay.  Mr. Podolsky.  And, Mr. Podolsky, just to

4  remind you and I was looking that your client, and Terrell

5  Davis face the -- the 924(c) related to the machine gun.  And

6  as you may know, that's a 30-year mandatory minimum.

7          **MR. PODOLSKY:**  Yes.  Yes.

8          **THE COURT:**  Okay.

9          **MR. PODOLSKY:**  I'm -- I'm reminded of that every time

10  I look at the --

11          **THE COURT:**  Okay.

12          **MR. PODOLSKY:**  Your Honor, just -- and -- and I guess

13  I can -- with regard to proffers, obviously, Judge, the -- the

14  Pretrial Services Report is admitted.  And that really -- that

15  discusses, you know, his background, his links to the

16  community.  I know the Court had said flight is not the issue,

17  it's the nature of the -- specific nature of the charges.  And

18  I get that, Judge.

19          So I will just -- just for purpose of the record, ask

20  the Court to consider that information considered in the

21  Pretrial Report, as far as his ties to the community, length

22  being in the community.

23          Noted that while he wasn't employed at the time of

24  his arrest, he had been previously employed this year and the

25  previous year as in construction.

1         And just getting to the facts, cause, obviously, this

2    is a complaint.  So probable cause is an issue.  I'll start

3    with the -- the proffer.

4         As pointed out -- and -- and obviously we were at a

5    bit of disadvantage yesterday.  Because we were handed, you

6    know, several reports during the hearing.  And -- and while the

7    Court did give us time, you know, the -- to attempt to review

8    those, it was just not possible to marshal all those facts in

9    such a short period of time.  But -- but going with what we did

10   go over, the proffer makes a lot of conclusory statements.

11        Obviously, there was that issue regarding Mr. Brown

12   being the driver of that vehicle, the black Alantra, where

13   the -- the -- the Glock 19's with the automatic switches were

14   found, which made the basis of those -- of that particular

15   charge that, as the Court pointed out, carries the 30-year

16   minimum sentence.

17        So, let's talk about that, cause I really -- cause

18   that is an important issue as far as probable cause.

19        **(Pause in the proceeding.)**

20        **MR. PODOLSKY:**  According to the -- there was

21   nothing -- no mention, anything about any surveillance of my

22   client getting in that Alantra, or getting out of that Alantra,

23   the black Alantra, or being anywhere near that Alantra within

24   this proffer.

25        And when pointed out to the -- the -- or the

1   detective in this case, then there was some testimony, well I

2   saw it on some surveillance.  Of course, which has never been

3   further explored or offered by the Government.

4            And it -- it seems --

5            **THE COURT:**  But -- but let me -- let me stop you.

6            So let me -- let me just say this to -- to everybody

7   before I give you my critique of that, that the one thing I

8   like about the federal system is the CJA Panel.  And -- and I

9   don't -- and hopefully the Defendants will appreciate like how

10  lucky they are to have the three of you and they're facing

11  these serious charges.

12           I think the three of you have done an excellent job.

13  And they're getting you for free.  Where the great thing about

14  the federal system is -- is you all, you can't even get on the

15  CJA panel unless you're experienced and you have private

16  clients that you charge thousands of dollars.  And that's --

17  that's the good thing about the Defendants in this case is

18  they're all in good hands.

19           And you faced a Herculean task yesterday of getting

20  all this and proceeding with the hearing and not knowing where

21  you're at.  But the Government's in the same position as far as

22  to me this proffer.  I mean, they're putting together this

23  proffer.  And they're doing it at my request as quick as

24  possible.

25           And you -- you have the agent.  And -- and I can't

1    expect him to put or sorry, the detective, everything that he

2    knows.  He's putting these things in conclusory fashion so he

3    can then be cross examined by you.  And -- and we're at just

4    the beginning of this case, you know.

5            It's not like we're at trial and he's putting

6    together this as a trial exhibit.  And to be honest, what I was

7    telling the folks this morning, you know, normally the

8    Government, and I've been a former prosecutor, they put up a

9    witness that knows the least about the case because they're

10   afraid of that person being cross examined and making

11   admissions that are going to hurt them at trial.

12           And here they -- they put up Detective Bock.  And in

13   my experience, you know, he -- he knows a lot about this case.

14   And he was more credible than, not to say that the other people

15   aren't credible, they just don't know anything.  And he knows a

16   lot.

17           And so the -- the question is, to me, not what he put

18   in there.  It's whether, you know, we believe what he's

19   saying's true, right?  So he's saying that the basis of -- and

20   I get your position is, is that the people on the ground that

21   were conducting the surveillance only saw three.  They didn't

22   see four.

23           And he's saying cause that's all they saw.  But then

24   we have the -- the -- the plane in the air and the helicopter

25   that's saying that there's video showing the four.  But more

1    importantly, he's also saying there's a call from your client

2    afterwards saying that he was the driver.

3            And so if you're asking me -- there's -- there's two

4    issues.  One, yes, you're kind of being, not intentionally, but

5    you're getting ambushed because it's not in the report.  But

6    the question is, is, you know, is it true.  And as we sit here

7    today and me making a probable cause finding, I don't know how

8    else -- how other I'd make that finding, based on the fact that

9    he's saying that there's video surveillance.  And more

10   importantly, your client's own admission as to being the

11   driver.

12           **MR. PODOLSKY:**  Well, and Judge, I'm not -- what I

13   understand this admission was, which was a surveillance of him

14   saying I just wrecked the Stollo (phonetic).

15           **THE COURT:**  Right.

16           **MR. PODOLSKY:**  Which car that is, I mean, I don't

17   know if that was established.  But that's the line that I heard

18   into evidence yesterday.

19           **THE COURT:**  Okay.

20           **MR. PODOLSKY:**  Now obviously, you -- the Court will

21   and should make reasonable inferences from that.

22           **THE COURT:**  Right.

23           **MR. PODOLSKY:**  I -- I get that.

24           **THE COURT:**  Right.

25           But -- but ultimately, I have to do it for the sake

1    of probable cause in determining the strength of the case.

2    But -- but my opinion really doesn't matter.  It's really what

3    12 jurors, if this case is going to go to trial, you know, what

4    is common sense and reason tell them.  Does that statement mean

5    that he was driving some other vehicle at some other place, or

6    the vehicle in question in this case, you know.

7            And so if you ask me, I'd say -- and I haven't heard

8    this.  I'm just basing this on what the detective is saying is,

9    is, you know, my -- my reasonable inference is he's talking

10    about this vehicle.

11            **MR. PODOLSKY:**  And -- and my only response, Judge,

12    and I -- I completely understand where the Court's coming from,

13    is that this didn't happen October 14th.  This happened August

14    14th.

15            They've had more than two months in preparation for

16    this complaint, for these arrests, for this hearing.  I mean --

17            **THE COURT:**  Okay.  But -- but on this --

18            **MR. PODOLSKY:**  -- cause everyone --

19            **THE COURT:**  -- but on this proffer.

20            So the way I do things is I -- they only had whenever

21    to put together that proffer a short amount of time.

22            And so, the question is, is what should he put in

23    that -- what should he put in that proffer, and to me I can't

24    really take, I mean, he's putting what -- he's putting there --

25    he's putting the -- what he thinks the conclusion is.  And --

```
 1   and your, you know, your position is he should have put more of

 2   the basis for that conclusions.

 3            And so --

 4            MR. PODOLSKY:  Or at least presented the Court with,

 5   you know, evidence, you know, to support that conclusion.

 6            I under -- because it -- it's different than if this

 7   was an indictment.  If this was an indictment --

 8            THE COURT:  Right.

 9            MR. PODOLSKY:  -- you know, there's no probable

10   cause.  It is what it is.  And it's really just about danger to

11   the community and -- and -- and flight risk.

12            But it is a complaint.  And so, you know, they do

13   have to meet, you know, a -- a probable cause standard.  And

14   that's -- that's why I'm --

15            THE COURT:  Okay.

16            MR. PODOLSKY:  -- I'm bringing is to the Court's

17   attention.

18            The -- the -- the Court heard the evidence that they

19   never saw Mr. Brown with the gun.  They never saw Mr. Brown

20   exchanging guns as they did other Defendants that day.  And out

21   in front of the XXXXXX address.

22            They never saw him handling a gun or -- or exchanging

23   guns.  They never saw him with a gun inside the vehicle.  Or

24   I -- I imagine if they had -- if their surveillance is as good

25   as able to identify him, that, you know, they didn't mention
```

1   anything about his holding a gun as he was running away after

2   wreck if, in fact, he was there.

3           They never saw him get in the vehicle, or arrive in

4   the vehicle.  There was no evidence that he was associated with

5   driving that vehicle any time prior.  And apparently, they had

6   been watching that house and him for several months prior to

7   this happening.

8           That's, you know, those are all -- and certainly,

9   those are going to be issues that we will, I'm sure, hash out

10  down the road.  But for purposes of today, and for purposes of

11  the decision that Court has to make, I would be remiss if I

12  didn't point that out.

13          **THE COURT:**  And I don't want you to think any -- what

14  I'm saying is not a critique of you.  It's that --

15          **MR. PODOLSKY:**  I -- I don't.

16          **THE COURT:**  Right.  okay.

17          **MR. PODOLSKY:**  I just --

18          **THE COURT:**  I want that to be clear.  I'm not

19  critiquing you.  You're doing the best you can with the

20  evidence you have.  And you're making all the arguments I'd be

21  making if I was standing where you are.

22          **MR. PODOLSKY:**  I appreciate that.

23          **THE COURT:**  Okay.

24          **MR. PODOLSKY:**  And -- and, you know, all of here

25  are -- have been --

1      **THE COURT:**  I mean, you have a really difficult job.

2  And so I don't want anything I say, I -- I know how difficult

3  your job is.  And you're taking --

4      **MR. PODOLSKY:**  I -- I get it, Judge.

5      **THE COURT:**  -- this appointment.

6      **MR. PODOLSKY:**  I'm not taking this --

7      **THE COURT:**  Okay.

8      **MR. PODOLSKY:**  -- as a critique of my work.

9      What I -- what I do understand is that, given the

10  nature of the charges, that certainly the -- the particular

11  background of each -- each Defendant, particularly in my case,

12  Mr. Brown, it's a -- it's a hurdle, a -- a rather high one.

13  And I get that.

14      **(Pause in the proceeding.)**

15      **MR. PODOLSKY:**  The -- I would just also like to point

16  out, I mean, obviously, they've had over two months prior to

17  come in today.  There's been no representation of any forensic

18  evidence, even fingerprints.  Those can be returned within

19  days.

20      I know, we all know, as anybody that's been a defense

21  or a -- certainly a prosecutor know that DNA evidence can come

22  back expedited if need be.  None of that has been presented to

23  the Court to link my client to any of the guns or even inside

24  that vehicle.

25      And -- and, Judge, so that -- that's my position as

1    far as probable cause on the -- the gun case.  As -- and as you

2    heard from the testimony from the detective, that he was not a

3    participant in any of the phone calls or messages that

4    specifically talked about hitting a lick, or 10P, or 3

5    automatics, or anything of that nature.  He was not a party to

6    those conversations, according to the Government's evidence.

7              And that that address where they met at, they all --

8    these same Free Money individuals would go there to do rap

9    videos and to perform.  And that was -- they had witnessed that

10   themselves.  And as I understand the testimony from social

11   media, they knew that that had happened on other occasions as

12   well.

13             There was some talk -- now with regard to the drugs.

14   As I understand it, the -- a -- a search was done of the drugs

15   last Friday, if -- and I think I'm correct on that when they

16   executed the warrants on this case.

17             And my client apparently, according to the testimony,

18   had been in that house prior to the execution of the warrant,

19   was not present when the warrant was executed.  And were there

20   two other individuals, one on parole, the other one with

21   criminal history.  Two males were inside that -- that home.

22             And that -- and then there were drug -- there were a

23   hundred grams of drugs, of cocaine found.  That's what the

24   Court was told as far as that day and that arrest.  There was

25   no information about any particular links to that drug, what

1   room it was in, was it near some -- was it in a drawer that

2   also had mail or -- or personal belongings that they could

3   associate with the Defendant.  I mean, we don't even know where

4   it was found, as I understand it, inside of that -- of that

5   home.

6            Was it, you know, sitting on the couch next to the

7   other two guys.  Was -- was, you know, of course once again, no

8   forensics to -- no real links.  It is a probable cause standard

9   but there has --

10           **THE COURT:**  Right.  But -- but -- but they're also

11  charging the drugs as a conspiracy and not as a possession, you

12  know.  So it's -- so there is a --

13           **MR. PODOLSKY:**  Okay.

14           **THE COURT:**  -- difference, you know.

15           **MR. PODOLSKY:**  Well I get that.  But, I mean, he

16  still has to be part of the conspiracy.

17           **THE COURT:**  Right.

18           **MR. PODOLSKY:**  There still has to be some overt acts

19  to link him to the conspiracy with that particular drugs.

20           I mean, it's -- it's two -- two and a half months,

21  almost two and a half months after the circumstances that

22  surrounded the arrest, or the alleged conspiracy to commit

23  robbery.

24           And I didn't hear any evidence that those two

25  individuals that, I guess were released and not charged, even

1   though they were in the home with -- I mean, if you're there

2   with the drugs and you don't get charged, what does that say

3   about the guy that wasn't there?

4       **THE COURT:**  Well, I don't -- I mean, there could be

5   other reasons why there's not charging.

6       **MR. PODOLSKY:**  And it certainly could.

7       **THE COURT:**  Right.

8       **MR. PODOLSKY:**  But -- or there wasn't any evidence

9   that those two individuals were part of the Free Money Gang, or

10  associated, or how they may or may not have been associated

11  with Mr. Brown.  None of that was brought to the Court's

12  attention.

13      And if they made the strategic decision to not

14  provide that today for whatever reasons, well, you know, I mean

15  that's the decision that the Government made.  And -- and once

16  again, there's still a probable cause standard.

17      And, Judge, I would -- and I guess in -- in

18  summation, I would say that, Judge, stepping away from the

19  flight risk, and the links to community, and all that, I

20  recognize that he has some criminal history, most, as far as I

21  can tell of note particularly, and I know the Court has this

22  report in front of them.

23      **(Pause in the proceeding.)**

24      **MR. PODOLSKY:**  A robbery from 2012 when he was 17.

25  The other ones, there's -- there's some other what I would

1    consider more minor offenses, a credit card abuse case, that

2    may have been pled down if he got one year state jail, or

3    I'm -- I'm not sure how that was pled out.  But I think credit

4    card abuse in State Court is a third degree.  And he was given

5    state jail.  So they had to have pled that down.

6            And then I know that the unlawful use of a criminal

7    instrument was reduced as well.  And then I guess he's got an

8    unlawful possession of a firearm by a felon pending in

9    Galveston County.

10           Judge, I would ask the Court just consider the

11   evidence that's -- that the Government to provide the Court

12   today knowing that this was still a complaint.  I would ask the

13   Court consider release of my client pending trial.

14           I understand the presumptions.  But from a fact

15   standpoint, a probable cause standpoint, I -- I would -- I

16   would think that the Court could fashion a -- a set of

17   restrictions and set of bond conditions that could protect the

18   community and insure his presence throughout these -- this

19   process, Judge.

20           **THE COURT:**  Okay.  Thank you.

21           Miss Collins?

22           **MS. COLLINS:**  Yes, your Honor.

23           Do you wish for me to argue probable cause or

24   strictly detention?

25           **THE COURT:**  Both.

1          **MS. COLLINS:**  Yes, your Honor.

2          **THE COURT:**  Just respond then to Mr. Podolsky's

3   points.

4          **MS. COLLINS:**  Absolutely, your Honor.

5          There -- couple of corrections I want to make from

6   what Mr. Podolsky stated.

7          **THE COURT:**  Can you make sure you're under a

8   microphone so everyone can hear.

9          **MS. COLLINS:**  Absolutely.

10         **THE COURT:**  Okay.

11      **(Pause in the proceeding.)**

12         **MS. COLLINS:**  Starting with the fact that Markel

13  Brown was, In fact, on several calls, at least two that I can

14  think of off the top of my head that are -- are included in the

15  proffer where he is speaking on the phone, which is

16  intercepted, to the others involved talking about not just the

17  job, but that he is part of the crew that is recruiting others

18  to participate in that job, which makes sense as a member of

19  Free Money who lives at that location and is over that -- that

20  territory, if you will.

21         Furthermore, as you've heard, I -- I think the

22  evidence is, in fact, clear about the fact that he was in a

23  vehicle, the driver of the vehicle, with the individuals who he

24  has recruited who have three Glock switches in that vehicle at

25  least that we know of, along with whatever he escaped with as

1   he was not arrested that night.

2          And I would argue, your Honor, that whether or not he

3   himself held a gun, this is a conspiracy case.  And as an

4   individual who on the phone calls is admitting to recruiting

5   those involved, whether or not he held a firearm with a Glock

6   switch or not, is a moot point I would argue to the Court.

7          Because as a party to this conspiracy, he is, in

8   fact, taking control of that conspiracy, along with Jcoi Barley

9   and Terry Ardoin.

10          And so, I would submit to the Court that it doesn't

11   really matter whether or not he is -- is one of the men

12   actually holding the gun.  He is the one putting those men in

13   the car to have those guns in the first place.

14          Furthermore, as you've heard, the Defendant himself,

15   Markel Brown, stated he was the driver of the Stollo that just

16   crashed out.  I know that the Court has read the proffer fully,

17   which states that that black Equinox was a stolen vehicle.

18   That is, in fact, why it was pulled over that night, or -- or

19   stopped on traffic.

20          And so it's clear that the only Stollo there is the

21   one in which he is seen fleeing from and therefore confesses

22   to.

23          I believe that covers Mr. Podlosky's points, unless

24   you have -- the Court had any questions for me.

25                  **THE COURT:**  Yes.  He -- he was making the point about

1    tying the drugs to the conspiracy.

2              **MS. COLLINS:**  Well --

3              **THE COURT:**  If the drugs are found in October, how

4    are they related to the conspiracy in August.

5              **MS. COLLINS:**  And -- and I -- I would submit that

6    they're two different issues.

7              Ultimately, the -- the August 14th conspiracy with

8    regard to drugs, was to steal the drugs from Ratchet (phonetic)

9    Man as they make clear on the phone calls.

10             The conspiracy is to steal those drugs, which they

11   state are pounds of drugs from Ratchet Man to then sell and

12   make a profit off of, separate and apart from the drugs that

13   are then found in his home upon the execution of the search

14   warrant.

15             But moreover, I would submit that that is simply a

16   detention issue.  Has nothing to do with the elements of the --

17   the underlying complaint offenses.  And I would also submit to

18   the Court that as we've heard from Detective Bock, there are, I

19   believe he said, approximately 50 separate phone calls in which

20   Markel Brown is discussing the sale of drugs.

21             Furthermore, he stated that they had surveillance on

22   XXXXXX, the place that he was living and residing, where drug

23   transactions were occurring.  So, I -- I think it's minding

24   words, if you will, whether or not that particular -- the drugs

25   found that day were his or not.

1          I would submit to the Court that either way he is

2    while on bond participating in the sale of drugs, which is a

3    law violation, which is clearly against the bond conditions

4    that he's been given.

5          **THE COURT:**  Okay.  Move on to the -- to detention as

6    to each of them.

7          **MS. COLLINS:**  Yes, your Honor.

8          First, again, with regard to Markel Brown.  Defense

9    counsel mentioned that he was very young at the time that he

10   received that first aggravated robbery.  And I would suggest

11   that that is, in fact, why he was given an opportunity in the

12   form of an eight-year probation, which he then violated.  And,

13   therefore, was sentenced to five TDC.

14         And not -- less than six years -- about five years

15   later, he's once again facing another felony offense for which

16   he receives a year of state jail.  And then a year later is,

17   again, in felony court with another year of state jail.  And

18   then he has the felon in possession, for which he's on bond for

19   and has been continuously on bond since January of 2022, while

20   he is talking about selling drugs on wire intercepts, as well

21   as committing the events of August 14th.

22         So I think his actions speak for himself.  That he

23   doesn't care about the conditions that he's given, and will not

24   follow those conditions, whether it's State Court of Federal

25   Court, your Honor.

 1          As to Trevonte Ardoin.  Again, I submit that all of

 2   the families of these men love them, and care about them, and

 3   would do everything they could for them.  And I believe that

 4   they have, and that they have family members who are, in fact,

 5   a part of their lives.  And, unfortunately, just have not been

 6   able to restrain these Defendants and prevent them from

 7   committing criminal activity.

 8          Trevonte himself states that he's been living at

 9   XXXXXX XXXX where his parents live.  And unfortunately, they --

10   they haven't been able to hamper his activities.  And I don't

11   believe that there's any evidence that that would change if he

12   were released today.

13          Obviously, the issue becomes the fact that he is also

14   on bond.  Putting that 45 Glock that's found at his house

15   aside, we've heard testimony that there are intercepts after he

16   makes bond, after he is told he is not allowed to possess

17   firearms, where he is looking actively for a replacement

18   firearm, a replacement rifle.  So again, violating the

19   conditions that he's been given.

20          And then on top of that, obviously, the fact that

21   we've heard testimony and in the form of the proffer that

22   the -- that Detective Bock watched the video surveillance of

23   the homicide that was committed, was able to ID Travonte and

24   Terry Ardoin by name and sight as the individuals committing

25   that homicide.  And I just -- there's obviously no greater

1     criminal enterprise than that.

2              Finally, as to Emery Goodley.  This is -- I would

3     submit to the Court we don't often see someone who has -- has

4     all the opportunities, is given all the chances in life, has

5     the smarts to accomplish great things in life.  And yet, as he

6     has made clear by his own admissions in his statement, the life

7     he has chosen is one of a gang lifestyle.

8              He stated, you know, I should be locked up.  If

9     released, I will just do more of the same.  He has told this

10    Court exactly how he will behave.

11             Furthermore, when we look at his background, at the

12    age of 15, he's certified I --as -- as -- as an adult.  And I

13    think that that speaks volumes to the fact that he is already

14    acting in such a way that the Harris County criminal sentence

15    would be that of an adult and given five years -- six years in

16    TDC for the aggravated robbery that he committed.

17             He has literally barely been out in 2019 when he is

18    committing an assault for which he receives 90 days.  And then

19    I would point out that the carrying a weapons charge that he

20    received, should have been a felon in possession.  It should

21    have been a felony offense as he is a felon in both the state

22    and federal systems.

23             And yet, he is again just doing what he wants, along

24    with the activities that occurred on August 14th of this year.

25             **(Pause in the proceeding.)**

1        **MS. COLLINS:**  And again, defense counsel pointed out

2   the fact that no one saw him possessing a firearm in his hand

3   at the time that he leaves the residence at XXXXXXX.

4        But we've heard testimony that he is gloving up.

5   He's putting a mask on.  He clearly knows what he is about to

6   go do.  And furthermore, when they find him, and get him out of

7   his seat, in plain view is a Mack (phonetic) Ten rifle right

8   next to where he's sitting.

9        He was in a position, despite being given every

10  opportunity, ready to go, smash in a door, and kill someone if

11  necessary.  That's the lifestyle he's chosen.

12       And because of that, I would argue that all three of

13  these men are a threat and danger to the community.  And that

14  there is no condition or combination of conditions that can

15  insure the safety of the citizenry.

16       **THE COURT:**  Okay.

17       **MR. CARTER:**  Just --

18       **THE COURT:**  Sure go ahead.

19       **MR. CARTER:**  If I may, your Honor.  I believe she

20  misspoke.

21       Because she stated that basically having a

22  conversation about a weapon is a violation of bond.  And it is

23  not.  It might be something that concerns you, but the record

24  should be clear that that's not a violation of bond or its

25  conditions.

1          **THE COURT:**  Well let me just say.  I mean, I -- I

2     don't want to get too far in the weeds.

3          But my understanding is she's saying that he's

4     talking on wiretaps after he was placed on the August bond of

5     purchasing other firearms.  And so you're saying that that

6     wouldn't be -- if his -- cause -- cause I'm looking at his

7     conditions from the August 14, 2022 is that, "Defendant must

8     not use or possess a firearm."

9          **MR. CARTER:**  Correct.  And so I'm saying having a

10    conversation about firearm is not a violation of those

11    conditions.

12         **THE COURT:**  But what if he's talking about -- and --

13    and you would know more, cause you dealt with this for many

14    years.

15         But I'm saying, let's just say hypothetically, cause

16    I don't listen to these tapes, that he's talking about

17    purchasing other firearms, or using other firearms, that's what

18    I understood Miss Collins to be representing that -- would that

19    be a -- a violation of is bond.

20         Not just casual conversations about guns, but

21    actually going out and purchasing other guns to replace a gun

22    that was seized, would that be a violation?

23         **MR. CARTER:**  I personally do not believe that's a

24    violation.  But I'm not saying that that's not a concern of the

25    Court.

1            **THE COURT:**  Okay.

2            **MR. CARTER:**  It's all I'm saying.

3            And I don't think that you disagree with that.

4            **MS. COLLINS:**  I do not.

5            I am not arguing that he has violated just by the

6    mere conversation.  But in making the point that despite being

7    told he is not allowed to have guns, he is still going and

8    actively stating that he is looking for a firearm to purchase.

9            **THE COURT:**  Okay.  Understood.

10           **MR. CARTER:**  Just for clarity, your Honor.

11           **THE COURT:**  Okay.

12           **MR. CARTER:**  Thank you.

13           **THE COURT:**  Does anybody else want to say anything

14   else before I --

15           **MR. FICKMAN:**  I do, your Honor.

16           **THE COURT:**  Okay.  Go ahead, sir.

17           **MR. FICKMAN:**  The statement was made about my client

18   that gun was at his feet and could have gone in and killed

19   somebody with it.  Well, that did not occur.

20           He was arrested, did not resist.  The firearm was at

21   his feet.  There's no indication that he reached for that

22   firearm.  I just want to make that clear.

23           **THE COURT:**  Okay.

24           **MR. FICKMAN:**  Anything can happen in this world, but

25   that didn't happen.  He surrendered.

1          **THE COURT:**  Okay.

2          **MR. FICKMAN:**  Thank you.

3          **THE COURT:**  Go ahead.

4          **MR. PODOLSKY:**  Judge, as -- for what it's worth, I --

5   I believe Miss Collins testified that -- that Mr. Brown was

6   part of conversations, text messages, or social media

7   indicating the commission of a crime.

8          As I recall the testimony, I asked the detective

9   specifically about that.  That, and my understanding is, that

10  the answer was he -- he was not part of the conversations they

11  were discussing criminality.  But just in general about a

12  meeting this afternoon, everyone needs to be there.  But it

13  wasn't -- there were no specifics about what that meeting was

14  for, or what they were going to do when they got there, or what

15  they were planning.

16         He was not a part of those conversations -- those

17  conversations where they were talking about Ratchet Man,

18  hitting a lick, 10P, 3 automatics.  Those were with other of

19  the co-conspirators, alleged co-conspirators.

20         And as I understand the testimony, and I could be

21  incorrect, but as I heard the testimony that the detective

22  testified that he -- Mr. Brown was not part of those

23  conversations or included in those messages.

24         You know, that's -- that's my position, your Honor.

25         **THE COURT:**  Okay.

40

1       **MS. COLLINS:**  I believe the proffer speaks for

2 itself.

3       **THE COURT:**  Okay.

4       So, I -- I'm going to repeat what I said this

5 morning.  And I -- and I apologize for the folks that are here

6 and -- and hear the same thing I'm going to say this morning.

7       But these decisions are never easy for a Magistrate

8 Judge.  Deciding bond is probably one of the most -- probably

9 one of the most difficult decisions that we have to make,

10 determining whether someone remains in custody or they're

11 released on bond.

12       After today I won't have any other involvement in

13 your case.  Your case will probably go to a Grand Jury.  And

14 then it's assigned to a District Judge.  And so my only job

15 today is -- is to find, you know, determine probable cause and

16 then decide the bond issue.

17       As to probable cause, I do believe that the

18 Government has proven probable cause as to each of the

19 Defendants here.  But -- but understand that just because I'm

20 finding probable cause it -- it's really meaningless in the

21 sense that at this stage, there's really no rules of evidence.

22 Hearsay's allowed.  I'm making a determination whether it's

23 based on a reasonableness.

24       Versus at trial, there's strict rules of evidence.

25 The -- the standard of proof is beyond a reasonable doubt.  And

1   it's 12 people making that decision.  So just because I found

2   probable cause doesn't necessarily meant that -- that all four

3   of you are guilty of the crime.

4          Now as to the bond, you know, I can tell you my

5   decision.  But -- but I think, and I'll give you a one minute

6   of, you know, the lens that I look at these cases is that, you

7   know, I've been practicing law for 25 years.

8          Before I became a judge, my career was evenly divided

9   between civil and criminal.  But between the criminal it was

10  half as a prosecutor and half as a defense attorney.  But other

11  than being married and having three kids, my proudest

12  accomplishment in life is I represented pro bono six federal

13  defendants that were serving life sentences who are now free.

14         And so when I was doing that work, I spent hundreds

15  of hours in federal prison.  And I -- and I spent time with

16  folks like you.  But I saw them on the back end after they

17  already served 20 or 30 years.

18         And -- and for all these people, the same arguments

19  that Miss Collins made were -- were right at that time.  But I

20  saw people make tremendous changes where when they served this

21  amount of time, they had zero infractions.  And they -- they

22  just did incredible things in federal prison to merit getting a

23  second chance and convincing people.

24         And so it -- it's not easy when we look at -- when we

25  look at you, Mr. Goodley, that -- like to play chess, like I

1    could never play chess cause I'm not smart enough to play those

2    moves, or even understand the game.

3           And so it's -- it's tremendous sadness.  It's there

4    for you, you know, that -- that -- that deep down it's there

5    that -- that you have that intelligence.  And it's just going

6    to be -- it's just going to be your choice going forward

7    what -- what you want to do in life.

8           But -- but you have that ability.  And -- and I don't

9    ever give up on people, you know.  But -- but it's -- but you

10    and -- and everybody else are going to have to make that

11    decision of -- of what you want to -- what you want to be in

12    life.  Cause it -- it's just not worth what we're seeing here.

13           And -- and as I said before, what the detective's

14    testimony, I mean, to me, this is a pretty strong case.  You

15    know, you -- you all are going to decide what you want to do.

16    And the great thing about the Constitution is you have that

17    right to go to trial and let 12 people decide.

18           But me just sitting here looking at this case, just

19    as quickly as your attorneys, that it's not every day in every

20    case that we have wiretaps, and we have pole cams, and we have

21    airplanes and helicopters.

22           That's just uncommon.  It just makes their job a lot

23    harder at -- at -- at trial.  And the stakes in these cases are

24    so high because, like with Mr. Podlosky's client, I mean, just

25    the -- the machine gun.  We're not even talking about the drugs

1  or other stuff, 30-year mandatory minimum.

2         This isn't a state case.  If you're convicted of that

3  charge, you're going to do 85 percent of that time.  That --

4  that's a minimum of, I'm not a math major.  That's why I went

5  into law school.  But I think it's about 24 years in prison or

6  more.  And that's a lot of time.

7         And that's the time that you're all -- you're all

8  facing in this case.  It's just, you know, between the 924(c),

9  the gun, and the mandatory minimum on drugs, it's a lot of

10  time.  But as I said before, I don't give up on people.  And

11  you have the ability to -- to make that change.

12         But I, you know, me sitting here, and reviewing this,

13  and looking at all the reports, I -- I don't believe any of the

14  Defendant have -- have overcome that presumption because of

15  the -- the seriousness of the case that we're talking about,

16  just this case.

17         And then -- and I know that he hasn't been charged as

18  far as Mr. Ardoin.  But, I mean, we have a detective testifying

19  that he -- that there was a shootout and someone was shot.  And

20  he's seen the video.  And Mr. Ardoin's going to the hospital

21  after he was shot in the shootout that to me the evidence is --

22  is pretty strong in -- in this case as to what was going on.

23         And then you combine that with the -- the criminal

24  histories.  And as Miss Collins says, you know, your families

25  love you and -- and as Mr. Fickman got up and -- and the people

44

1   that he's addressing are all strong characters.  But the case

2   isn't -- the case isn't against your family and how strong

3   character are.  It's about you all.

4           And so, again, you know, it's not easy me telling you

5   you're going to be detained.  But I -- I felt like by telling

6   you this that there's some explanation on my part.

7           So again, I find the Government's shown probable

8   cause.  And as to the three Defendants, the presumption has not

9   been met.

10          Let me start with Judge Carter.  Anything else I need

11  to address?

12          **MR. CARTER:**  No, your Honor.

13          **THE COURT:**  Okay.

14          **MR. CARTER:**  Thank you for your patience.

15          **THE COURT:**  Okay.  Mr. Podolsky?

16          **MR. PODOLSKY:**  No, sir.

17          **THE COURT:**  Okay.  Mr. Fickman?

18          **MR. FICKMAN:**  No, sir.  No, your Honor.

19          **THE COURT:** And Miss Collins.

20          **MS. COLLINS:**  No, your Honor.

21          **THE COURT:**  Okay.  Thank you all.

22          Good luck, gentlemen.

23      **This proceeding was adjourned at 02:28 p.m.)**

24

25                      * * * * * * *

1

2                             CERTIFICATION

3   I certify that the foregoing is a correct transcript from the

4   electronic sound recording of the proceedings in the above-

5   entitled matter.

6        /s/*Cheryl L. Battaglia*                    April 4, 2023

7              Transcriber                              Date

8   4:22-CR-577-8

9   10/27/22 - 04/04/23